

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JASON INOFF,
Plaintiff,

        v.

CRAFTEX MILLS, INC., ROBERT BLUM, JACK
EGER, AND ROBERT PROSKE,
Defendants.

CIVIL ACTION

NO. 06-3675

**FILED**

DEC 1 2 2007

MICHAEL E. KUNZ, Clerk

By _____ Dep. Clerk

## Memorandum and Order

December *11*, 2007

YOHN, J.

Plaintiff Jason Inoff filed this action against defendants Craftex Mills, Inc. and three of its officers: Robert Blum, President; Jack Eger, Vice President of Sales and Marketing; and Robert Proske, Chief Financial Officer.[1]  The four-count complaint alleges that defendants are liable for (1) breach of an employment contract with Inoff; (2) violations of the Pennsylvania Wage Payment and Collection Law, 43 Pa. Cons. Stat. § 206.1 *et seq.*; (3) promissory estoppel; and (4) unjust enrichment.  Currently pending before the court is defendants' motion for summary judgment on all four counts.  For the following reasons, I will grant the motion in part and deny it in part.

---

[1] Defendant Craftex Mills, Inc. is referred to as "Craftex"; defendants Blum, Eger, and Proske are collectively referred to as "the officers"; and "defendants" is used to refer to all four defendants—Craftex and the officers.

I.      **Background and Procedural History**

From early 1994 until April 2007, Inoff worked in the fabric and textile industry, mostly as a sales representative. (Inoff Dep. 11:12-35:23; 209:11-222:2, Feb. 23, 2007.)  In May 1997, he began working for Bartson Fabrics as its northeast sales representative.  (*Id.* 13:7-18:6.) There, a written agreement provided that he be paid on a commission basis, five percent for sales to manufacturers and eight percent for retail sales.  (*Id.* at 21:13-16.)  While working as a sales representative for Bartson, Inoff also represented a number of other companies.  (*Id.* at 22:9-30:17, 52:17-55:7.)  Inoff earned $94,649.82 during his last full year with Bartson.  (*Id.* at 247:14-16.)

In September 2004, while at the Brussels Airport in Belguim, Inoff met Michael Paul, a sales representative for Craftex, who covered its northeast territory.  (*Id.* at 42:7-43:12; Paul Dep. 19:2-19, May 4, 2007.)  Through Paul, Inoff met Neil Nahoum, Paul's partner at Craftex.  (Inoff Dep. 47:2-9.)  In or about May 2005, Nahoum told Inoff that Nahoum was leaving Craftex, and Inoff contacted Paul to discuss whether there might be an opportunity for Inoff as a sales representative for Craftex.  (*Id.* at 57:7-15, 60:10-61:16.)

In July 2005, Inoff met briefly with Paul and Eger at a trade show in Craftex's showroom in North Carolina; they discussed Inoff's customers and related experience.  (*Id.* at 68:16-70:16; Eger Dep. II,[2] at 24:18-25:21, May 8, 2007.)  Eger and Inoff then exchanged phone calls, and Eger asked Inoff to come to Craftex's headquarters in Blue Bell, Pennsylvania for an interview on August 10 or 11, 2005.  (Inoff Dep. 79:12-80:10.)  There, he met with Blum, Eger, and

---

[2] Jack Eger was deposed twice, once as the corporate designee for Craftex (referred to as "Inoff Dep. I") and once in his individual capacity (referred to as "Inoff Dep. II").

Proske, and they discussed Inoff's experience and the companies he was representing, as well as Craftex's customers, design staff, and philosophies. (*Id.* at 81:15-84:19.) Inoff asserts that compensation was discussed at this meeting. (Pl.'s Reply to Def.'s Statement of Uncontested Facts ¶ 38.) Craftex invited Inoff back for a second interview, held either August 31 or September 1, 2005, again in Blue Bell, Pennsylvania, at which Craftex intended to make Inoff an offer. (Eger Dep. II 42:18-43:3; Inoff Dep. 92:7-93:24.) At that meeting, again with Blum, Eger, and Proske, Craftex offered Inoff an arrangement in which he would receive a 1.2% commission on sales. (Eger Dep. II 44:1-46:8; Proske Dep. 23:12-18 (undated); Inoff Dep. 94:9-96:14.) Based on the prior year's sales, this arrangement could be expected to earn Inoff $150,000 per year. (Eger Dep. II 44:1-46:8; Proske Dep. 23:12-18; Inoff Dep. 94:9-96:14.) Inoff rejected this offer, believing that accepting it would have constituted a "lateral move" from Bartson because the difference in pay would not have been enough. (Inoff Dep. 248:6-16.) When asked what compensation he was looking for, Inoff answered $225,000 per year; the parties ultimately agreed on $200,000, translating to a 1.33% commission rate on sales. (*Id.* at 97:8-99:22.) The $200,000 figure was, both parties agree, only an estimate based on the previous year's sales; the actual amount paid to Inoff could be less than or more than $200,000, depending on the actual value of the current year's sales. (*Id.* at 98:22-99:4.)

In addition to negotiating a commission rate at the second interview, Inoff alleges that the parties negotiated a contract term. When asked what, other than the commission rate, was agreed upon at the second interview, Inoff testified:

> A.    I said to them that the only way I would leave my current job working at Bartson Fabric was with a contract.
> Q.    And by that, did you mean a written contract?

A.       I just—I meant a contract, an agreement.
Q.       . . . . What were you looking for?
A.       I was looking for a five year agreement that I would work for Craftex Fabrics.
. . . .
Q.       Tell me exactly what you recall you said about a five-year agreement.
A.       When I said I wanted a contract to leave Bartson Fabrics Bob Blum asked me
what I was looking for.  I said, "I would like a five-year contract."
         He said, "[W]e will give you three."
Q.       Is that the entire discussion in that regard?
A.       Yes.

(*Id.* at 99:24-102:19.)  The parties did not discuss Craftex's ability to terminate the relationship.

(*Id.* at 106:4-10, 121:14-122:3.)  Nevertheless, while not specifically discussed, Inoff understood

that Craftex could terminate the relationship and Inoff would not be paid if Inoff did something

wrong (by, for example, failing to show up or do any work, selling drugs on company premises,

or going on vacation for nine months).  (*Id.* at 114:20-116:4.)  Inoff testified that he understood,

however, that "if the contract was terminated I would be paid for the balance of the contract at a

rate of 1.33 calculated for the balance of the contract."  (*Id.* at 119:20-23.)

      Finally, the parties discussed Inoff's continued representation of other companies.  (*Id.* at

103:12-106:2.)  Inoff left the meeting with the understanding that he would give up his

representation of Guleser, a mill he represented, within six to twelve months.  (*Id.* at 104:13-

105:4.)  At the conclusion of this meeting, the parties shook hands on their deal and said how

excited they all were about a long future together.  (Pl.'s Answers & Objections to First Set of

Interrogs. of Defs. 10; *see also* Blum Dep. 27:4-7 (undated).)

      On September 7, 2005, Inoff received a written "Independent Contractor Agreement"

from Craftex via email.  (Inoff Dep. 130:4-9; *see also* Brief in Supp. of Defs.' Mot. for Summ. J.

("Defs.' Mem.") Ex. E; Pl.'s Mem. of Law in Opp'n to Defs.' Mot. For Summ. J., Ex. L.)  The

agreement was adapted by Craftex from Nahoum's previous agreement with Craftex. (Blum Dep. 28:5-29:3.) The agreement contained a three-year term, according to Blum, because Nahoum's contract contained that term and "[i]t seemed like a reasonable term." (*Id.* at 29:22.) Inoff never signed this agreement, however, because "[t]here were a few things that were wrong, that weren't based on our initial agreement, so I was not going to sign it because there were a few things that . . . weren't accurate." (Inoff Dep. 132:16-23.) The writing listed a commission rate of 1.3%, rather than the agreed-upon 1.33%;[3] it omitted Inoff's continued representation of Abraham Moon, and it required Inoff to give up the Guleser representation in 90 days. (*Id.* at 133:3-134:5.) The writing included numerous terms that were never discussed in either the first or second interview. (*Id.* at 139:9-145:24.) Inoff asserts, nevertheless, that the writing reflects the "essential terms, including, for example, the term of the agreement, the compensation rate, the position to be performed, and the time to start performance [that] were all previously agreed upon during the final meeting in Blue Bell, [Pennsylvania]." (Pl.'s Resp. to Def.'s Statement of Undisputed Facts 11; Inoff Dep. 139:14-140:7.)

After speaking briefly with Eger about the inaccuracies, Inoff emailed him a list of the inaccuracies at the end of September 2005. (Inoff Dep. 134:6-135:19.) Inoff got no response, and so he raised the issue with Eger again by leaving a note on Eger's desk in February 2006. (*Id.* at 137:7-138:3.) Eger again did not respond. (*Id.* at 138:23-24.) Inoff did not discuss the inaccuracies with anyone else at Craftex. (*Id.* at 137:15-19, 138:18-22.) Thus, the writing remained unsigned during Inoff's tenure at Craftex.

---

[3] Apparently Inoff was paid at the rate of 1.33% during the time he worked as a sales representative for Craftex. (Inoff Dep. 133:6-8.)

Plaintiff began working for Craftex as a sales representative on or about September 1, 2005. (*See* Pl.'s Mem. 15.)  On April 15, 2006—less than eight months later—Craftex terminated Inoff.  (*Id.* at 209:11-16; *see also* Pl.'s Mem. Ex. P.)  Eger explained to Inoff that the relationship was not working out because of problems with Inoff's work ethic, his ability to work with Craftex's designers, and a decline in orders received.  (Inoff Dep. 211:23-212:2.)  At that time, Craftex agreed to pay Inoff three equal payments of $11,700 (totaling $35,100), "the commission value" of the "current backlog of the New York territory."  (Pl.'s Mem. Ex. P.)  These payments were contingent on an "amicable and non-disparaging separation" and "there will be no other money or compensation due."  (*Id.*)  Inoff never signed the letter, so he was never paid.  (Eger Dep. II 131:14-16.)

On August 17, 2006, Inoff filed suit in this court.  Defendants answered the complaint, denying all material allegations.  The parties engaged in discovery, including document requests, interrogatories, and depositions of Inoff, Blum, Eger (individually and as the representative of Craftex), Proske, and Paul.

## II.   Standard of Review

A motion for summary judgment will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its initial burden, the non-moving party must present

"specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986) (quoting Fed. R. Civ. P. 56(e)). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.* 90 F.3d 737, 743 (3d Cir. 1996) (quoting *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995)). The non-movant must present concrete evidence supporting each essential element of his claim. *Celotex*, 477 U.S. at 322-23.

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Furthermore, "all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy Farms*, 90 F.3d at 744 (quoting *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3d Cir. 1991)). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990). The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden of production. *Anderson*, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

III.    **Breach of Contract, Promissory Estoppel, and Unjust Enrichment Claims**

   A.       **Count I: Breach of Contract**

   Plaintiff asserts that he had an oral, three-year guaranteed contract with Craftex and that Craftex breached the contract by failing to pay Inoff the balance owed to him in accordance with the contract's terms.  Inoff alleges that the parties had "a three-year term of employment based on an oral agreement that was later memorialized in a series of writings, one of which was signed by the President of Craftex." (Pl.'s Mem. 1.)  Inoff bases his claim on Paragraph 7(c) of the writing.[4]   Craftex argues, however, that "the parties failed to enter into any binding contract.  Rather, Inoff was engaged as an independent contractor, same as all other Craftex sales representative[s], and that engagement was terminable at will by either party." (Defs.' Mem. 11.)  Craftex argues that New York's statute of frauds bars enforcement of any oral contract or, in the alternative, that under Pennsylvania law no contract between the parties included a term of employment.

   1.       **Choice of Law**

   Defendants argue New York contract law should apply to the dispute; Inoff argues that Pennsylvania law should apply.  Thus, I must first decide which state's law to apply.  A federal court exercising its diversity jurisdiction must apply the choice of law rules of the forum state, *Klaxon Co. v. Stenton Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941), so I will apply

---

   [4] Neither party argues that the writing is an enforceable contract.  The controversy centers on an alleged *oral* agreement.  Inoff asserts that "[i]t is Plaintiff's position that a binding oral agreement was reached during the Blue Bell, Pennsylvania meeting on September 1, 2005." (Pl.'s Mem. 16.)

Pennsylvania's choice of law rules.

The Pennsylvania Supreme Court has adopted a "flexible rule which permits analysis of the policies and interests underlying the particular issue before the court." *Griffith v. United Airlines, Inc.*, 203 A.2d 796, 805 (Pa. 1964). The approach "gives to the place having the most interest in the problem paramount control over the legal issues arising out of a particular factual context and thereby allows the forum to apply the policy of the jurisdiction most intimately concerned with the outcome of the particular litigation." *Id.* (internal quotation marks and alterations omitted) (quoting *Babcock v. Jackson*, 191 N.E.2d 279, 283 (N.Y. 1963)). The *Griffith* "interest/contacts" approach applies to contract disputes. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 228 (3d Cir. 2007).

The first step of the analysis is to examine the competing laws to determine whether a true or false conflict exists. A false conflict exists if the competing laws would produce the same result. *Id.* at 229. Initially at issue are Pennsylvania's and New York's statutes of frauds. Pennsylvania's statute of frauds does not limit enforcement of oral contracts to those that can be performed within a limited period of time. *See* 33 Pa. Cons. Stat. §§ 1-6; *see also Gallagher v. Med. Research Consultants, LLP*, No. 04-236, 2004 WL 2223312, at *3 (E.D. Pa. 2004). Therefore, if an oral contract providing for a three-year term of employment was actually made, as Inoff asserts it was, it would be enforceable under Pennsylvania law.

New York's statute of frauds provides that a contract that cannot "[b]y its terms . . . be performed within one year from the making thereof" is void unless it is "in writing, and subscribed by the party to be charged therewith, or by his lawful agent." N.Y. Gen. Oblig. Law § 5-701. The relevant question is whether the contract, "by its terms," cannot be performed within

9

one year. *See Weiner v. McGraw-Hill, Inc.*, 443 N.E.2d 441, 444 (N.Y. 1982). The statute "encompass[es] only those contracts which, by their terms, have absolutely no possibility in fact and law of full performance within one year." *Cron v. Hargro Fabrics, Inc.*, 694 N.E.2d 56, 58 (N.Y. 1998) (internal quotation marks omitted).

If a contract that contemplates performance beyond one year nevertheless permits termination within one year, the contract is outside New York's statute of frauds. In *North Shore Bottling Co. v. C. Schmidt & Sons, Inc.*, the Court of Appeals of New York faced the question "whether the defendant's power under the agreement itself to put an end to it within the year . . . took the agreement out of the operation of the statute [of frauds]." 239 N.E.2d 189, 191 (N.Y. 1968). The court held that the agreement was outside the statute, for "if the obligation of the contract is not, by its very terms, or necessary construction, to endure for a longer period than one year, it is a valid agreement, although it may be capable of an indefinite continuance." *Id.* "Performance . . . is simply carrying out the contract by doing what it requires or permits," and, "where the contract itself creates the power of termination and the legal privilege of exercising [that power]," the existence of that power takes a case outside of the statute." *Id.* at 191 & n.2.

The alleged written (but unsigned) memorialization of orally agreed-upon terms at issue here, which was prepared and submitted by Craftex, provides for termination of the agreement prior to the end of the three-year term. (*See* Defs.' Mem. Ex. E, ¶ 6.) Whether this provision was a part of the oral contract is not clear, however, because Inoff testified that it was never discussed. If it was, the alleged contract is capable of being performed within one year, and it would be outside of New York's statute of frauds. Pennsylvania and New York law thus would not conflict on the issue of the enforceability of the oral promise, and Pennsylvania law would

apply.

Assuming, on the other hand, that the parties had not negotiated and agreed to the termination provision (or for that matter, any provision in the writing),[5] but had simply orally agreed to a three-year contract that could not, by its terms, be performed within one year—as Inoff alleges they did—the choice of law analysis must continue because Pennsylvania and New York law would then conflict. The result of the analysis, however, would be the same, and Pennsylvania law would again apply.

The second step of the analysis is to determine which of the states has the greater interest in having its law apply to the dispute. "If the states' laws do in fact conflict, the court must determine which state has the greater interest in the application of its law." *Hammersmith*, 480 F.3d at 229. "If there are relevant differences between the laws, then the court should examine the governmental policies underlying each law, and classify the conflict as a 'true' [conflict], 'false' [conflict], or an 'unprovided-for' situation." *Id.* at 230. A "'false conflict' exists 'if *only one* jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's laws.'" *Id.* (quoting *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 (3d Cir.1991)) (emphasis added). "An 'unprovided-for' situation is one in which *neither* state's interests would be impaired if its laws were not applied." *Id.* at 230 n.9.

New York's statute of frauds was "was designed to guard against the peril of perjury; to prevent the enforcement of unfounded fraudulent claims." *Morris Cohon & Co. v. Russell*, 245 N.E.2d 712, 715 (N.Y. 1969). Thus, the purpose of the New York rule is to protect the party

---

[5] Inoff testified during his deposition that the parties never discussed the possibility of an early termination or their relationship. (Inoff Dep. 143:6-19, Feb. 23, 2007.)

against whom an oral contract is sought to be enforced.  In this case, that party is Craftex, a citizen of Pennsylvania.  Therefore, New York's policies underlying its statute of frauds would not be impaired by application of Pennsylvania law.

Similarly, Pennsylvania's policies would not be impaired by application of New York law.  As mentioned above, Pennsylvania's statute of frauds does not bar enforcement of contracts that cannot be performed within one year; there is legislative silence on the issue of their enforceability.  I, like other judges of this court, am "wary of divining legislative intent from legislative silence." *Gallagher*, 2004 WL 2223312, at * 5.  "Nevertheless, a fair inference here is that Pennsylvania's silence reflects a belief that the Commonwealth's interest in enforcing oral contracts exceeds its interest in preventing fraud and perjury." *Id.*  Assuming that interest, the Pennsylvania rule seeks to protect the party attempting to enforce the oral contract—here, Inoff, a citizen of New York.

Because neither Pennsylvania's nor New York's policies would be impaired by application of the other state's law, this is an unprovided-for case.  In this situation, "courts should apply the traditional, lex locus contractus rule." *Hammersmith*, 480 F.3d at 230 n.9. Thus, the place where the contract is made determines which state's law will apply.  *See Crawford v. Manhattan Life Ins. Co. of N.Y.*, 221 A.2d 877, 880 (Pa. Super. Ct. 1966).  As explained above in the recitation of facts, the alleged contract was negotiated and entered into at Craftex headquarters in Blue Bell, Pennsylvania.  Thus, the lex locus contractus is Pennsylvania, and so Pennsylvania law—under which there is no statute of frauds problem—will apply.[6]

---

[6] Moreover, the writing prepared by Craftex and given to Inoff for his signature provides that "[t]his agreement shall be governed by, and construed and enforced in accordance with the laws of the state of Pennsylvania."  (Def.'s Mem. Ex. E, ¶ 9.)

The analysis so far has focused only on Pennsylvania's and New York's statutes of frauds. This case involves not only questions about whether a statute of frauds applies, but also whether a contract was in fact entered into and how to construe any such contract and, additionally, whether Craftex is liable under a theory of promissory estoppel or unjust enrichment. Rather than go through the choice of law analysis with respect to each issue, I will simply enumerate here the factors demonstrating that Pennsylvania law will apply with respect to the entire dispute.

If a true conflict exists on any issue of law regarding the alleged agreement—and for the purposes of this analysis I assume one does[7]—the court must determine which state has the greater interest in the application of its law by examining both (1) the parties' contacts establishing significant relationships with the states in accordance with the Second Restatement of Conflicts, and (2) the relevant states' policies with respect to the controversy. *Hammersmith*, 480 F.3d at 231. The contacts must be weighed "on a qualitative scale according to their relation to the policies and interests underlying the particular issue." *Id.* (internal alterations omitted) (quoting *Shields v. Consol. Rail Corp.*, 810 F.2d 397, 400 (3d Cir. 1987)).

Pennsylvania has the most significant relationship to the alleged contract. According to the Second Restatement of Conflicts, the following contacts should be taken into account:

(a)     the place of contracting,
(b)     the place of negotiation of the contract,
(c)     the place of performance,

---

[7] As explained below, Pennsylvania has the most significant contacts with the dispute. It also has a governmental interest in protecting its corporations from having contracts they have not actually entered into enforced against them (i.e., protecting their expectations). Therefore, whenever there is a true conflict on an issue involving enforcement of the alleged agreement, Pennsylvania law will apply.

13

(d) the location of the subject matter of the contract, and

(e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties.

Restatement (Second) of Conflicts § 188(2) (1971). As explained above, the place of negotiating and contracting was Pennsylvania, for Pennsylvania is where the parties met in person, negotiated terms, and shook hands on their agreement. The corporate defendant is a citizen of Pennsylvania, and defendants Blum and Proske are citizens of Pennsylvania.[8] (Compl. ¶¶ 7-9, 11; Answer ¶¶ 7-9, 11.) Factors (a), (b), and (e) thus weigh heavily in favor of the application of Pennsylvania law. Factors (c) and (d), the place of performance and the location of the subject matter of the contract, are inconclusive, as Inoff's representation of Craftex took place in Pennsylvania, in New York, and elsewhere. Therefore, Pennsylvania has the most significant contacts.

Pennsylvania has an interest in its law being applied, as it has a general interest in protecting its corporations' legitimate expectations of the terms of their contracts. So doing "creates a stable business environment and thereby helps the Commonwealth achieve its commercial potential." *Amco Ukrservice v. Am. Meter Co.*, 312 F. Supp. 2d 681, 689 (E.D. Pa. 2004). The alleged contract was negotiated and entered into in Pennsylvania, and Inoff is attempting to enforce it against a Pennsylvania corporation. Given the significance of the contacts with Pennsylvania and Pennsylvania's policies and interests, Pennsylvania law applies to the dispute.

_____

[8] Defendant Eger is neither a resident nor a citizen of Pennsylvania (Answer ¶ 10.) No further information has been provided about his residency or citizenship.

14

### 2.    Existence of a Contract

Craftex argues that the parties did not enter into a binding employment contract that provided Craftex would pay Inoff a 1.33% commission for a guaranteed three-year term. Rather, Craftex contracted only to engage Inoff as an independent contractor, with the relationship terminable at will at any time. Because the terms of an oral contract and the construction of those terms are questions for the finder of fact, I will deny summary judgment on this issue.

"Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" *Ware v. Rodale Press, Inc.*, (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). The first element is at issue here. For a valid contract to exist, there must have been a "meeting of the minds" between the parties. *See United States v. Arreguin-Jimenez*, 60 Fed. Appx. 895, 897 (3d Cir. 2003) (citing *Eliscu v. Fiber*, 157 F.2d 136, 138 (3d Cir. 1946)). A meeting of the minds is found where "both parties mutually assent to the same thing, as evidenced by an offer and its acceptance." *Refuse Mgmt. Sys., Inc. v. Consol. Recycling & Transfer*, 671 A.2d 1140, 1146 (Pa. Super. Ct. 1996) (quoting *Hahnemann Med. Coll. & Hosp. of Phila. v. Hubbard*, 267 Pa. Super. Ct. 436, 406 A.2d 1120 (1979)).

A genuine issue of material fact exists as to whether the parties had a meeting of the minds with respect to a three-year term. Inoff argues that they did. He testified: "When I said I wanted a contract to leave Bartson Fabrics Bob Blum asked me what I was looking for. I said, 'I would like a five-year contract.' He said, '[W]e will give you three.'" (Inhoff Dep. 102:20-22.) That was the entire discussion of the length of the contract (Inoff Dep. 102:17-19), meaning that

Inoff never explicitly accepted the three-year offer. Inoff testified, nevertheless, that "I left understanding we had come to an agreement that I would start working for Craftex for three years." (Inoff Dep. 108:11-14.) In addition, he did in fact leave Barton and begin work for Craftex. Furthermore, the written contract Craftex presented to Inoff (but that Inoff never signed) reflects Craftex's understanding that the relationship would be for a three-year term. (*See* Defs.' Mem. Ex. E, ¶ B ("The Company and Jason Inoff wish to enter into an Agreement wherein Jason Inoff becomes an independent contractor of the Company for a period of three (3) years from the date of September 1, 2005.").)

Defendants, however, argue that the three-year term was not discussed during the September 1, 2005 meeting. Blum testified that at the September 1, 2005 meeting with Inoff, there was no discussion "about a term for his period of agency." (Blum Dep. 27:13-20.) Proske testified similarly, stating that the term of Inoff's representation was not discussed at the September 1, 2005 meeting. (Proske Dep. 28:19-21.) Likewise, Eger testified that Inoff did not tell Craftex that he needed "security in the form of some term of an agreement." (Eger Dep. 47:7-16.) Therefore, the parties dispute the terms of the contract.

"Under Pennsylvania law, where there is a dispute as to which set of several circumstances, some expressed in writing and some oral, constitute the agreement between the parties it is the jury's function and not the court's to determine which set of circumstances constitutes the true agreement." *Barnhart v. Dollar Rent A Car Sys., Inc.* 595 F.2d 914, 918 (3d Cir. 1979) (internal quotations and alterations omitted). Moreover, the defendants have not met their burden of showing the absence of a genuine issue for trial. Therefore, the question whether the parties' contract included a three-year term is not one appropriately decided at the summary

16

judgment stage. A reasonable jury could find that the contract was for a three-year term.

If the parties' contract did contain a three-year term, the next question is what the parties intended the consequence of that term to be or, stated as plaintiff does, whether that term was "guaranteed." (*See* Compl. ¶ 15.) The unsigned written contract contains provisions regarding termination of the contract (Paragraph 6) and the parties' rights upon termination (Paragraph 7). (Defs.' Ex. E, ¶¶ 6-7.) The parties did not discuss these terms during their negotiations, however. Inoff testified as follows with respect to Paragraph 6[9]:

> Q.     Paragraph 6 refers to termination.  Could you read Paragraph 6(a) and indicate whether or not there was any discussion about that subject matter?
> A.     That was never discussed.
> Q.     Paragraph 6(b), likewise, refers to termination.  Was there any discussion about that subject matter in your discussions?
> A.     No.
> Q.     Paragraph 6(c) refers to termination in the even of death or incapacity.  Was that discussed in August of 2005 with Craftex representatives?
> A.     No.

(Inoff Dep. 143:6-19.) Similarly, Inoff testified that the provisions setting forth his rights upon

---

[9] Paragraph 6 provides:
Termination.
       (a) Jason Inoff's service hereunder may be terminated by either party in the even of the other party's failure to perform in accordance with any of the material terms and conditions of this Agreement.  In the even that either party desires to terminate this agreement in accordance with this provision, it shall give the other party at least ten (10) days notice of such desire and the specific basis of the claim that the other party has failed to perform in accordance with this agreement.  During this ten (10) day period, the parties will meet and make a good faith effort to resolve the issues.
       (b) Upon mutual written agreement.
       (c) Death of Jason Inoff or illness or incapacity that prevents him from performing his duties for six (6) months or one hundred twenty (120) aggregate working days in any calendar year.
(Def.'s Mem. Ex. E, ¶ 6.)

termination were never discussed[10]:

> Q.      Paragraph 7(a) describes the rights upon termination.   Was there any discussion on that subject matter in August, 2005?
> . . . .
> [A.]    No, that was never discussed.
> . . . .
> Q.      So it was included for the first time in what's been marked as Inoff Deposition Exhibit 2?
> A.      Correct.
> Q.      Would you look at the remaining subparagraphs of Paragraph 7 and indicate whether or not there was any discussion about any of that subject matter?
> A.      No, none of those were discussed.

(Inoff Dep. 143: 20-145:13.)

Likewise, the parties did not discuss whether the three-year term was "guaranteed." Inoff

testified that he believed it was: "I was under the impression that if the contract was terminated I

would be paid for the balance of the contract at a rate of 1.33% calculated for the balance of the

-----

[10] Paragraph 7 provides, in relevant part:
Rights Upon Termination.
   (a) Upon termination of the Service Period (unless Jason Inoff's service is continued by mutual agreement), upon termination of this Agreement in accordance with paragraph 6(b) above, or upon termination of this Agreement by Jason Inoff in accordance with paragraph 6(a) above, Jason Inoff shall be entitled to commissions on all orders shipped to New York sales territory accounts within two (2) months following the effective date of termination, and the parties acknowledge and agree that Jason Inoff shall not be entitled to any other compensation or payment.
   (b) Upon termination of this agreement by the Company in accordance with paragraph 6(a) above, or by Jason Inoff without cause, Jason Inoff shall be entitled to commissions on all orders shipped to New York sales territory accounts prior to the effective date of termination, and the parties acknowledge and agree that Jason Inoff shall not be entitled to any other compensation or payment.
   (c) If the Company or its successors unilaterally terminates this contract without cause prior to the expiration, Jason Inoff shall receive compensation for the duration of the original term of the contract at the average monthly rate of the twelve (12) months prior to termination, but Jason Inoff will be held to the restrictions contained in Section 3(c).
(Def.'s Mem. Ex. E, ¶ 7.)

18

contract." (Inoff Dep. 119:20-23.)  He did not form this impression on the basis of anything said

during the September 1 meeting, however:

> Q.      And all of this was your understanding but not based upon anything that was
> actually stated at the meeting?
> . . . .
> [A.]    Yes.
> . . . .
> Q.      Was there a discussion about the concept of an early termination?
> A.      No.
> Q.      Was there a discussion about what would happen in the event of your death
> or disability?
> A.      No.
> Q.      Was there a discussion about what would occur in the event that you decided
> to leave?
> A.      No.

(Inoff Dep. 120:17-122:3.)

In Pennsylvania, "[i]t is well settled that in the case of a disputed oral contract, what was

said and done by the parties as well as what was intended by what was said and done by them are

questions of fact for the jury." *Solomon v. Luria*, 246 A.2d 435 (Pa. Super. Ct. 1968) (citing

Pennsylvania Supreme Court cases).  The inquiry into "the understanding of the parties as

expressed by [the terms of the contract]" is for the jury. *McCormack v. Jermyn*, 40 A.2d 477,

479 (Pa. 1945).  If the finder of fact concludes that the contract included a three-year term, the

question whether that term was "guaranteed" and the rights and obligations of the parties upon

early termination is likewise a question for the finder of fact.  Again, a reasonable jury could find

for plaintiff on these issues.  Therefore, I will deny summary judgment on the breach of contract

issue.[11]

---

[11] Inoff has alleged breach of contract not only by Craftex, a corporation, but also by its
officers.  The individual liability of defendants Blum, Eger, and Proske is addressed in Part IV,
*infra*.

19

**B.**     **Count II:  Pennsylvania Wage Payment and Collection Law**

Inoff claims he was an employee of Craftex, and that the defendants "willfully failed to pay Plaintiff wages earned . . . during the course of his employment within the time limits prescribed by the" Pennsylvania Wage Payment and Collection Law, 43 Pa. Cons. Stat. § 260.1 *et seq.* ("WPCL"), and, "[f]ollowing the end of Plaintiff's employment, Defendants willfully failed to pay Plaintiff wages earned within the time limits prescribed by the WPCL." (Compl. ¶¶ 51-52.)  Defendants argue that Inoff was not an employee, but an independent contractor, and so the WPCL is not applicable.

The WPCL applies, by its terms, only to "employees."  It provides, with respect to current employees:

> Every employer shall pay all wages . . . due to his employe[e]s on regular paydays designated in advance by the employer. . . . All wages . . . earned in any pay period shall be due and payable within the number of days after the expiration of said pay period as provided in a written contract of employment or, if not so specified, within the standard time lapse customary in the trade or within 15 days from the end of such pay period.

43 Pa. Cons. Stat. § 260.3.  As to terminated employees, the WPCL provides:

> Whenever an employer separates an employe[e] from the payroll, or whenever an employe[e] quits or resigns his employment, the wages or compensation earned shall become due and payable not later than the next regular payday of his employer on which such wages would otherwise be due and payable.

*Id.* § 260.5.  "Wages" are defined to include "all earnings of an employe[e], regardless of whether determined on time, task, piece, commission or other method of calculation."  *Id.* § 260.2a.  The law creates a private civil remedy, *id.* § 260.9a(a), against both corporations and their officers, *see Mohney v. McClure*, 568 A.2d 682, 684-85 (Pa. Super. Ct. 1990).

The relevant question here is whether Inoff was an employee within the meaning of the

WPCL. "Employee" is not defined by the WPCL, so Pennsylvania courts look to the

Unemployment Compensation Act's and the Worker's Compensation Act's definitions. *See*

*Morin v. Brassington*, 871 A.2d 844, 849 (Pa. Super. Ct. 2005). "One who is an 'independent

contractor' is not an 'employee' within the meaning of the definition of 'employee' in the

Worker's Compensation Act." *Id.* According to the Pennsylvania courts, the following factors

are relevant to the question whether one is an independent contractor:

> the control of the manner that work is to be done; responsibility for result only; terms
> of agreement between the parties; the nature of the work or occupation; the skill
> required for performance; whether one employed is engaged in a distinct occupation
> or business; which party supplies the tools; whether payment is by the time or by the
> job; whether the work is part of the regular business of the employer, and the right
> to terminate the employment at any time.

*Surowski v. Commonwealth*, 467 A.2d 1373, 1374 (Pa. Commw. Ct. 1983). "[P]aramount . . .

among these factors is the right of an individual to control the manner that another's work is to

be accomplished." *Morin*, 871 A.2d at 850.

The defendants argue that "other than the power to terminate, Craftex had no right of

control over the manner in which Inoff managed his customers or how he conducted relations

with customers," and power to terminate is not sufficient to transform one from an independent

contractor to an employee. (Defs.' Mem. 21.) Inoff argues, to the contrary, that "[t]he record is

filled with references to Defendants' criticisms of Mr. Inoff's work, and these criticisms show

that Defendants[] expected to control the manner in which Mr. Inoff performed his position."

(Pl.'s Mem. 20.) Inoff is perhaps too optimistic, for he cites only two examples: "Defendants

have suggested that the reason they terminated Mr. Inoff was because of Mr. Inoff's alleged

failure to be in the New York [o]ffice on Fridays, and Mr. Inoff's alleged failure to spend

21

sufficient time in Blue Bell, Pennsylvania with the designers." (*Id.* (internal citations omitted) (citing Eger II Dep. 92:1-93:22; Eger II Dep. 80).)  While this is certainly not "substantial evidence that Craftex exercised control over Mr. Inoff's work" as Inoff claims (*id.* at 20-21), it is more than the "mere scintilla" necessary to create a genuine issue of material fact for trial. Therefore, I will deny summary judgment as to Inoff's claim under the WPLC, even though the facts suggest that Inoff will have a difficult time prevailing on this issue.

### C.       Count III:  Promissory Estoppel

Defendants argue that the parties "failed to enter into any binding contract.  Rather, Inoff was engaged as an independent contractor . . . , and that engagement was terminable at will by either party." (Defs.' Mem. 11.)  Inoff has asserted a promissory estoppel claim in the event that a jury agrees that no enforceable contract existed between the parties.  Inoff claims that he was promised a three-year term of employment and that he "stressed to the representatives of Craftex . . . that it was important that his relationship with Craftex . . . be of a long duration in order for it to make sense for him to leave his then employment with Bartson, Inc." (Compl. ¶ 14.)  By transferring to Craftex, "Mr. Inoff suffered to the extent that he gave up a potential for continued, or life-long employment when he left his position with Bartson in reliance on promises from Craftex." (Pl.'s Mem. 19.)  Defendants argue, however, that "[l]eaving Bartson to work for Craftex . . . is not sufficient to establish that Inoff suffered a detriment." (Defs.' Mem. 17.)

Whether Inoff was an employee or an independent contractor is highly relevant to the question whether he is entitled to proceed on his promissory estoppel claim:  Pennsylvania law does not permit a claim based on promissory estoppel by an *employee*; a claim based on

promissory estoppel by an *independent contractor* does not appear to be precluded, however.

If Inoff was an employee, he cannot succeed on his promissory estoppel claim. Pennsylvania's at-will employment presumption precludes an at-will employee's cause of action for promissory estoppel. *See Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 646 & n.33 (E.D. Pa. 2004) (citing cases applying Pennsylvania law). If Inoff can show a term employment contract—either an express contract, *see supra* Part III.A.2, or a contract implied by the presence of additional consideration[12]—then a promissory estoppel claim is unnecessary. If he cannot

---

[12] "Pennsylvania presumes all employment to be at-will." *Scully v. US WATS, Inc.*, 238 F.3d 497, 505 (3d Cir. 2001). "[A]bsent a contract, [employment] may be terminated by either party at any time, for any reason or for no reason." *Cashdollar v. Mercy Hosp. of Pittsburgh*, 595 A.2d 70, 72 (Pa. Super. Ct. 1991). "The party attempting to overcome the presumption must show clear and precise evidence of an oral employment contract for a definite term." *Scully*, 238 F.3d at 505. Alternatively, an employee can defeat the presumption by establishing "that the employee gave his employer additional consideration other than the services for which he was hired." *Cashdollar*, 595 A.2d at 72 (citing *Scullion v. EMECO Indus.*, 580 A.2d 1356, 1358 (Pa. Super. Ct. 1990); *Marsh v. Boyle*, 530 A.2d 491, 493 (Pa. Super. Ct. 1987); *Darlington v. Gen. Elec.*, 504 A.2d 306, 314 (Pa. Super. Ct. 1986); *Veno v. Meredith*, 515 A.2d 571, 580 (Pa. Super. Ct. 1986); *Lucacher v. Kerson*, 45 A.2d 245, 248 (Pa. Super. Ct. 1946), *aff'd*, 48 A.2d 857 (Pa. 1946)).

Additional consideration is found where "an employee affords his employer a substantial benefit other than the services which the employee is hired to perform, or when the employee undergoes a substantial hardship other than the services which he is hired to perform." *Darlington*, 504 A.2d at 315. The employee may show that he has "justifiably rel[ied] upon an implied promise that the employment will be terminated only for cause," for example, by showing that "the employee was induced to leave his former employment with the assurance that he would not be dismissed without cause in the new employment." *Id.* at 311. "It is a question of fact whether, in a given case, an employee has given additional consideration sufficient to rebut the at-will presumption. The question of the intent of contracting parties is generally a jury question." *Scullion*, 580 A.2d at 1358.

Inoff has not specifically alleged that additional consideration passed between Craftex and him. He has alleged, however, justifiable reliance on defendants' promises of term employment. (*See* Compl. ¶ 40.) Whether that reliance was sufficient to create an implied contract for term employment, taking his employment outside of Pennsylvania's at-will employment presumption, is relevant to Inoff's breach of contract claim, rather than his promissory estoppel claim. And, as noted above, that question is one for the jury.

23

overcome the presumption of at-will employment, then he is an employee at will, and his promissory estoppel claim will be precluded.

If Inoff was not an employee, but was an independent contractor as defendants allege, a theory of promissory estoppel is a permissible alternative argument to the presence of a term contract.  Pennsylvania's bar to promissory estoppel claims of terminated at-will employees has not been applied to independent contractors who were promised a specific contract term.

Pennsylvania has adopted the Second Restatement's theory of promissory estoppel, under which, in the absence of an enforceable contract, a promise that induces reasonable reliance on the part of the promisee may be binding "if injustice can be avoided only by enforcement of the promise."  *Green v. Interstate United Mgmt. Servs. Corp.*, 748 F.2d 827, 830 (3d Cir. 1984) (quoting Restatement (Second) of Contracts § 90(1) (1981)).  The elements are:

> 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise.

*Edwards v. Wyatt*, 335 F.3d 261, 277 (3d Cir. 2003) (citing *Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000)).  "A party who invokes the rule of promissory estoppel as a basis for relief has the burden of proving that he acted to his detriment in reliance on the promise."  *Kaufman v. Mellon Nat'l Bank & Trust Co.*, 366 F.2d 326, 332 (3d Cir. 1966).  That party "must prove that the action taken amounted to a substantial change of position."  *Id.*  Leaving one's previous employment can be sufficient detriment.  *Cf. Darlington*, 504 A.2d at 311 (noting, in the context of overcoming the at-will employment presumption, that "the mere fact that an employee surrendered his or her former position does not necessarily suggest that the employer-promisor

24

should have contemplated such reliance").

Assuming Inoff was an independent contractor, the same disputed facts relevant to his breach of contract claim create genuine issues of material fact relevant to Inoff's promissory estoppel claim. Based on the record, a reasonable jury could find that Craftex promised to engage Inoff as an independent contractor for some term, thereby inducing him to terminate his allegedly potential life-long employment with Bartson. A reasonable jury further could find that, as a result of Craftex's promise and Inoff's reliance, Inoff suffered a detriment.

In sum, two disputes require that defendants' motion for summary judgment on Inoff's promissory estoppel claim be denied. First, a genuine issue of material fact exists as to whether Inoff was an employee or an independent contractor. Second, assuming Inoff was an independent contractor, genuine issues of material fact exist as to whether he detrimentally relied on promises made by Craftex. Therefore, defendants' motion will be denied as to Count III.

### D.   Count IV: Unjust Enrichment

"When there is no express contract between the parties, a plaintiff may still recover under a quasi-contract theory," for example, a theory of unjust enrichment. *Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.*, 832 A.2d 501, 507 (Pa. Super. Ct. 2003). Succeeding on a claim of unjust enrichment requires the following elements be proven: (1) "benefits conferred on defendant by plaintiff," (2) "appreciation of such benefits by defendant," and (3) "acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *AmeriPro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa. Super. Ct. 2001). "The most significant element of the doctrine is whether

the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff." *Id.*

With respect to the first element, a plaintiff "cannot merely allege its own loss as the measure of recovery—i.e., the value of labor and materials expended—but instead must demonstrate that appellee has in fact been benefitted." *Meehan v. Cheltenham Twp.*, 189 A.2d 593, 595 (Pa. 1963). In his complaint, Inoff alleged that "Plaintiff conferred benefits on Defendants." (Compl. ¶ 7.) Inoff has not, however, explained or provided evidence showing what these benefits were, how they were conferred, or their dollar value. He has only demanded payment "for unpaid commissions and compensation for the duration of the original term of the contract totaling $411,980.52." (Compl. ¶ 32.) This amount—presumably "compensation for the duration of the [remaining term] of the contract at the average monthly rate of the twelve . . . months prior to termination" (Pl.'s Mem. Ex. E, ¶ 7(c))—reflects only his own alleged loss.

As to the third element, "the mere fact that one party benefits from the act of another is not of itself sufficient to justify restitution. There must also be an injustice in permitting the benefit to be retained without compensation." *Meehan*, 189 A.2d at 596. Again, Inoff has presented no evidence relevant to this element, and his pleading is spare. With respect to this element, Inoff alleged only that "[i]njustice can be avoided only by enforcing the promises of Defendants," and "[a]cceptance and retention of such benefits under the circumstances herein described make it inequitable for Defendant to retain the benefits without payment of value to Plaintiff." (Compl. ¶¶ 39, 43.) While that may be sufficient to state a claim, it is not sufficient to

survive a motion for summary judgment.[13]  For these reasons, I will grant defendants' motion for summary judgment in favor of the defendants on plaintiff's unjust enrichment claim.


IV.     **Individual Liability of Craftex's Officers**

The officers argue that they are entitled to summary judgment on Inoff's breach of contract, promissory estoppel, and unjust enrichment claims because they acted only on behalf of Craftex and within the scope of their authority to act on its behalf.  (Defs.' Mem. 23.)  In response, Inoff asserts that "Mr. Blum, Mr. Proske, and Mr. Eger may be held personally liable on each of Plaintiff's claims . . . for breach of contract, promissory estoppel, and unjust enrichment . . . if they cannot avail themselves of the corporate shield doctrine."[14]  (Pl.'s Mem. 21.)

The corporate shield doctrine protects officers and directors by limiting the extent to which actions performed in the officers' corporate capacities may be used to exercise jurisdiction over them individually.  *See, e.g.*, *Neyer, Tiseo & Hindo, Ltd. v. Russell*, No. 92-2983, 1993 WL 52552, at *3 (E.D. Pa. Feb. 25, 1993); *Maleski v. DP Realty Trust*, 653 A.2d 54, 62-63 (Pa. Commw. Ct. 1995).  As this court's jurisdiction over the officers has not been questioned, the corporate shield doctrine is inapplicable.

Presumably plaintiff intended to assert that the officers can be held liable if the corporate

---

[13] Had Inoff claimed only unpaid commissions earned during the time he worked as a sales representative for Craftex, he might have survived summary judgment on such a claim.

[14] The parties agree that the individual defendants are rightfully included in Count II, alleging violations of Pennsylvania's WPCL, as that statute provides for liability of officers and directors.  *See Mohney*, 568 A.2d at 684-85.

27

veil can be pierced.  Pennsylvania courts are, however, unlikely to pierce the corporate veil, save in a few narrow circumstances. *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 353 (3d Cir. 2001).  A "court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception." *Wedner v. Unemployment Comp. Bd. of Review*, 296 A.2d 792, 795 (Pa. 1972) (quoting *Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir.1967)).

Officers "are not held liable for the corporation's breach of a contract absent an establishment of participation theory or the successful assertion of the equitable doctrine of piercing the corporate veil." *Realvest, Inc. v. Avery Builders, Inc.*, 600 A.2d 601, 603 (Pa. Super. Ct. 1991).  "[T]he breach of the contract is the breach of a promise made by the corporation, and not the breach of any promise extended by the corporate officer." *Loeffler v. McShane*, 539 A.2d 876, 879 (Pa. Super. Ct. 1988).  Thus, "only the corporation may ordinarily be held liable for contract damages." *Id.*  An officer may be liable only (1) under the participation theory "for the breach of any promises or representations which he extends not in his capacity as an officer but personally in his individual capacity," or (2) "in appropriate circumstances, . . . under the equitable doctrine of piercing the corporate veil." *Id.* at 879 n.3.  The corporate veil will be pierced only when one of the following is present:  "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs[,] and use of the corporate form to perpetrate a fraud." *Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995).

Inoff does not mention in either his complaint or his memorandum of law in opposition to defendants' motion for summary judgment any actions taken by the officers that would warrant

the imposition of individual liability under either theory. In fact, he alleges that "Defendants . . . were acting within the authorized scope of their relationship with Craftex." (Compl. ¶ 12). He has not pointed to any deposition testimony that would support piercing the corporate veil, and this court can find none. Therefore, the officers are entitled to summary judgment on Inoff's breach of contract claim.

The officers are not entitled to summary judgment on Inoff's WPCL claim. As noted in the discussion of that claim, *see supra* Part III.B, the WPCL creates a private civil remedy against both corporations and their officers. *See Mohney*, 568 A.2d at 684-85.

The officers are entitled to summary judgment on Inoff's promissory estoppel claim. No individual liability results under a theory of promissory estoppel when the promise was made by a representative of the corporation acting in his official capacity. *Excedo Inc. v. ColumbusNewport, LLC*, No. 03-1158, 2006 WL 897729, at *9 (W.D. Pa. Mar. 31, 2006) ("Plaintiffs never argue that [defendants] made promises or misled them while acting in their individual capacities. Accordingly, the Court will grant summary judgment in favor of [defendants] on [p]laintiffs' promissory estoppel claims."); *Linville v. ConAgra, Inc.*, No. 1:04-CV-00004-WRW, 2004 WL 3167119 (E.D. Ark. May 19, 2004) (holding that because "promissory estoppel [i]s more like a contract action . . . no individual liability attached because [defendant] was an agent for a disclosed principle" and that "[t]his is a common principle in contract law, and those courts to address the issue have extended this rule to promissory estoppel actions"). This is so because, in this context, promissory estoppel claims are treated as contract claims. *See Crouse*, 704 A.2d at 1093 (holding that "promissory estoppel falls under the umbrella of contract law").

Finally, as I have already explained that I will grant defendants' motion for summary judgment on Inoff's unjust enrichment claim, I need not separately analyze that claim with respect to the officers. Even if that were not the case, summary judgment would be granted in favor of the officers, given that Inoff has produced not even a scintilla of evidence showing that the officers personally retained any benefit. *See Bouriez v. Carnegie Mellon Univ.*, No. 02-2104, 2005 WL 3006831 (W.D. Pa. Nov. 9, 2005) ("[Plaintiff] has not produced any evidence to support its assertion that it relied upon personal promises of [defendant] to pay it for work on the project. Therefore, [plaintiff] has not established that [defendant's] retention of a benefit, if he had received any, would be unjust." (footnote omitted)).

## V.   Conclusion

Defendants' motion for summary judgment will be granted in part and denied in part. A genuine issue of material fact exists as to whether the alleged oral contract between Inoff and Craftex included a three-year term and, if it did, the consequences of early termination of the contract. Therefore, I will deny summary judgment as to Count I, alleging breach of contract, with respect to defendant Craftex. I will grant summary judgment, however, in favor of defendants Blum, Eger, and Proske as to Count I because of a lack of evidence showing that these defendants acted in their individual capacities or that the corporate veil should otherwise be pierced.

A genuine issue of material fact exists with respect to whether Inoff was an employee and so entitled to the protections of the WPCL. That statute creates liability not only for corporations, but also for their officers and directors. Therefore, summary judgment will be

denied as to all defendants with respect to Count II.

With respect to Count III, alleging promissory estoppel, summary judgment will be denied with respect to defendant Craftex because of the presence of genuine issues of material fact.  I will grant summary judgment, however, in favor of defendants Blum, Eger, and Proske as to Count III because of a lack of evidence showing that these defendants, acting in their individual capacities, made any promise to Inoff.  Finally, summary judgment will be granted in favor of all defendants as to Count IV, alleging unjust enrichment.

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JASON INOFF,
Plaintiff,

      v.

CRAFTEX MILLS, INC., ROBERT BLUM, JACK
EGER, AND ROBERT PROSKE,
Defendants.

:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION

NO. 06-3675

**FILED**

DEC 1 2 2007

MICHAEL E. KUNZ, Clerk
By _____ Dep. Clerk

## Order

**AND NOW**, this __11__ day of December 2007, upon consideration of the summary

judgment motion of defendants Craftex Mills, Inc.; Robert Blum; Jack Eger; and Robert Proske

(Docket No. 15) and plaintiff Jason Inoff's response thereto, **IT IS HEREBY ORDERED** as

follows:

1.      With respect to Count I, alleging breach of contract, defendants' motion for summary

judgment is **GRANTED** as to defendants Blum, Eger, and Proske, and defendants'

motion for summary judgment is **DENIED** as to defendant Craftex.  Judgment is entered

in favor of Blum, Eger, and Proske on Count I.

2.      With respect to Count II, alleging violations of Pennsylvania's Wage Payment and

Collection Law, 43 Pa. Cons. Stat. § 260.1 *et seq.*, defendants' motion for summary

judgment is **DENIED**.

3.      With respect to Count III, alleging promissory estoppel, defendants' motion for summary

judgment is **GRANTED** as to defendants Blum, Eger, and Proske, and defendants'

motion for summary judgment is **DENIED** as to defendant Craftex.  Judgment is entered

in favor of Blum, Eger, and Proske on Count III.

4.      With respect to Count IV, alleging unjust enrichment, defendants' motion for summary judgment is **GRANTED** as to all defendants.  Judgment is entered in favor of defendants and against plaintiff on Count IV.

5.      Trial is scheduled for February 19, 2008 at 10:00 a.m.

_____
William H. Yohn Jr., Judge